IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION

ERIC S. MILLER and CHASITY MILLER and
ROCKY D. MILLER and JAMIE MILLER,                                          Plaintiffs,


v.                                                                No. 3:10-cv-00063-MPM-SAA


GENIE INDUSTRIES, INC; TEREX CORPORATION and
REBEL EQUIPMENT & SUPPLY COMPANY,                                          Defendants


## ORDER

This cause comes before the court on the motions of defendants to strike the testimony of

plaintiffs' expert witness Samuel Sero and for summary judgment.  Plaintiffs have responded in

opposition to the motions, and the court, having considered the memoranda and submissions of

the parties, concludes that the motions are well taken and should be granted.

This is a products liability action in which plaintiffs seek recovery arising out of a May 7,

2009 accident involving a TMZ 34/19 aerial work platform manufactured by defendant Genie

Industries, Inc. ("Genie").  The accident occurred on a worksite in Holly Springs when the

platform's upper jib boom broke, causing plaintiffs Eric and Rocky Miller to fall and injure

themselves.  The lift was sold to plaintiffs' father Bobby Miller by defendant Rebel Equipment

& Supply Company ("Rebel") on January 26, 2004, and plaintiffs contend that the lift was

missing owner's and operator's manuals at the time of sale.   It is undisputed that, shortly prior to

the accident, the plaintiffs had their uncle Roy Owens weld the upper jib boom to repair what

they characterize as small cracks in it.  All parties agree that welding an aluminum jib boom such

as the one in this case may cause it to fail, but plaintiffs assert that defendants negligently failed

to warn them of such a risk.

Plaintiffs make somewhat contradictory arguments regarding the cause of the jib boom failure, with their engineering expert Samuel Sero asserting that, regardless of any negligence in failing to warn against welding, the welding "was not a substantial factor" in causing the accident. Sero contends that the primary cause of the failure was, instead, a design defect in the TMZ 34/19 which, he contends, made it susceptible to stress failures. Sero also asserts, however, that the welding caused the jib boom to weaken, and plaintiffs appear to assert in their briefing that the welding was, in fact, at least a partial cause of the jib boom's failure. Defendants respond that plaintiffs "broke" the jib boom by misusing it and that they exacerbated the situation by having it welded. Defendants have presently moved for summary judgment, arguing that plaintiffs' design defect and failure to warn claims all lack merit and should be dismissed. Defendants have also filed a *Daubert* motion to exclude Sero's testimony as lacking reliability. This court views the *Daubert* and summary judgment issues in this case as being largely inter-related, and it will discuss them in conjunction with one another.

In the court's view, the central fact of this case, for both *Daubert* and summary judgment purposes, is that Bobby Miller discarded the most important piece of evidence in this litigation, namely the jib boom whose failure resulted in the injuries to plaintiffs. Clearly, this was an extremely unfortunate decision which has, as discussed below, rendered it impossible for a trier of fact to come to any reliable conclusions regarding what caused the jib boom failure and the resulting injuries in this case. Moreover, Sero's apparent efforts to reconcile certain contradictions in plaintiffs' failure to warn and design defect claims, without any objective factual basis for doing so, ultimately only serves to destroy his credibility in the eyes of the

2

court.  This necessitates the striking of Sero as an expert witness and, in turn, constitutes an

additional basis for dismissing plaintiffs' claims.

In the court's view, the discarding of this crucial evidence might have been somewhat

more understandable if it had been done in the confusion surrounding the immediate aftermath of

the accident.  Instead, Bobby Miller testified that he did not throw it away until he had arranged

with Rebel salesman Dustin Blackburn to secure a replacement jib boom:

> Q All right. And part of our problem here, we don't have that jib arm, right, today,
> sir?
> A Huh-uh.
> Q Isn't that correct?
> A Yes, sir, that's correct, because when I taken the thing off, I told Dustin, I said,
> "Look, I have got to have a new one." And he ordered me a new one. And he
> called me Monday or Tuesday of the next week.
> Q Okay.
> A This was on a Saturday.
> Q Yes, sir.
> . . .
> And when I got back to the shop, I remember how we took the thing off to get it
> welded, and I was already nervous energy. I said, "Well, let me take this dang
> thing off," since Dustin told me -- I told him Saturday before we left, I said, "Go
> ahead and order me one." I said -- he said,  "Okay." So I knew we were going to
> have to take it off. So I taken the thing off. And we've got a dumpster. And I just
> dumped it, you know. It wasn't no good to me no more, you know.

In his affidavit, Bobby Miller appeared to point the finger at Blackburn for not telling him that

he should retain the jib boom in order to pursue a potential lawsuit.  Specifically, Bobby Miller

asserted that:

> When the broken upper jib arm was removed and replaced at my shop after my
> sons' accident, I was not asked by Dustin Blackburn, who was then present, to
> save the jib or keep it for some future purpose.  Dustin Blackburn did not tell me
> that the jib was defective, or that he knew of a problem or prior failures or a recall
> of the jib on the TMZ 34/19.  Had I known at that time or before I discarded the
> upper jib arm that Rebel wanted me to keep the jib, or that Genie knew that its
> jibs were prone to fail or had a recall relating to this jib, or that a lawsuit might
> arise out of the accident, I would certainly have kept it.  My discarding the jib was

3

not an effort to destroy or spoil evidence.

In the court's view, Miller's attempt to blame Blackburn for not advising him to keep the jib boom in order to pursue a potential lawsuit against his employer is less than persuasive. It is clearly unrealistic to expect defendants to advise someone to consider suing them, and the decision to discard this crucial evidence was Miller's alone.

This court will give plaintiffs the benefit of the doubt that Miller was not attempting to intentionally destroy evidence, but there are nevertheless strong policy considerations against permitting parties to discard evidence without facing significant consequences. While Miller's discarding of the evidence may well have been innocent, there is no way for any court to discern a litigant's true motivations in this regard. There are no doubt some unscrupulous plaintiffs who would only be too happy to discard evidence which they feel harms their case, if they believe that the consequences of such will not be severe. At the same time, it is true that Bobby Miller is not actually a plaintiff in this case but is the father of two of the plaintiffs.

At any rate, the court does not view this issue as involving the assignment of blame as much as the simple fact that plaintiffs, rather than defendants, have the burden of proof in this case. Accordingly, this court must determine whether, in the absence of the actual jib boom, plaintiffs are able to meet their burden of proof on their design defect and/or failure to warn claims. For the reasons discussed below, it concludes that they are not. In so concluding, the court would first acknowledge that plaintiffs do have some proof in support of their design defect claim, which is based, *inter alia*, upon a theory that Genie's use of aluminum, rather than steel, materials in crucial parts of the aerial lift rendered it unreasonably dangerous to users.

In the court's view, the strongest part of plaintiffs' case is their proof that Genie had

previously issued a recall of certain units of the TMZ 34/19 based upon reports of product

failures.  Defendant argues that this recall involved an earlier design of the TMZ 34/19 and that

the aerial lift utilized by plaintiffs had been fitted with additional safety features which addressed

the weaknesses in the previous design.  Plaintiffs respond that these modifications were

insufficient and that Genie should have fitted the jib boom with a steel cap which its own

engineer designed and retrofitted on aerial lifts which had been recalled.

In the court's view, plaintiffs do appear to present a coherent *theory* that the jib boom

was defectively designed, although, as discussed below, they failed to buttress this theory with

actual testing.  In the court's view, such objective testing of a substitute jib boom was

particularly essential in light of the discarding of the actual product.  Even such testing may have

ultimately proved insufficient, but it was clearly incumbent upon plaintiffs to go the "extra mile"

in at least attempting to prove their claims in the absence of the jib boom itself.  Instead,

plaintiffs have presented the court with an expert who, as discussed below, offers admittedly

untested theories which appear to be based upon his (often changing) perceptions of what

testimony the plaintiffs' claims require, rather than upon any objective facts.

It should also be emphasized that plaintiffs' proof regarding alleged design defects goes

merely to the issue of *breach of duty*, and establishing such a breach is, in and of itself,

insufficient to establish liability without a showing of *causation*.  In the court's view, it would be

impossible for plaintiffs to prove causation in this case after the discarding of the actual jib

boom, and they exacerbated this failure by adopting contradictory theories of what caused the jib

boom to fail.   Indeed, it strikes this court that plaintiffs seek to play "both sides of the fence" on

the causation issue, in a manner which raises serious fairness concerns.

There is some circumstantial evidence that the welding of the upper jib boom was, at the very least, a contributing factor in its failure. All parties agree that welding an aluminum jib boom such as the one in this case may cause it to fail, and the evidence indicates that the jib boom failed on the very first occasion it was used after it had been welded. Moreover, plaintiffs themselves argue, in their failure to warn claim, that more specific warnings should have been placed in product manuals and on the jib boom itself, cautioning against welding on the product. In order to prevail on this claim, it is plainly insufficient for plaintiffs to establish that defendant should have included additional warnings against welding on the jib boom. Rather, as with any tort theory, plaintiffs must prove a <u>causal connection</u> between this failure to warn and the injuries which they suffered.

It is thus implicitly alleged in plaintiffs' failure to warn claim that the welding of the upper jib boom was a substantial factor in causing the jib boom's failure and the resulting injuries in this case. Plaintiffs make this argument explicit in their response to the motion to strike Sero's testimony, writing that:

> defendant's expert David Moore admits that <u>if the Miller's had been told not to weld the upper jib arm, the subject accident might have been prevented</u>. The plaintiffs agree.

(emphasis in original) Plaintiffs support this statement with a citation to plaintiff Rocky Miller's affidavit stating that:

> I have small children and do not readily place myself in danger. There was no warning not to weld the upper jib arm area provided to use. If there had been, I would have made sure that the jib was not welded by anyone.

It is thus abundantly clear that plaintiffs maintain, when it advances their interests to do so, that there was a causal connection between the welding of the upper jib boom and the accident in this

6

case.

The court therefore finds it highly suspect that, when they are seeking to prove their

design defect claim, plaintiffs offer Sero's testimony that:

> 10. The welding repair of the aluminum jib by Roy Owens near the end of the
> aluminum jib was not a substantial factor in the jib failure that occurred in this
> incidence. The weld did not fail. The TMZ 34/19 failed due to a defect and
> unreasonably dangerous condition in the 34/19 lift Genie; and neither Roy Owens
> nor the Millers caused the accidental collapse of the 34/19 by any unforseeable
> misuse, abuse or neglect of the TMZ 34/19.

Plaintiffs similarly state, in their response to defendant's motion to strike Sero's testimony, that

"the welding repair of the jib by Roy Owens near the end of the aluminum jib was not a

substantial factor in the jib failure." Sero's views, which are at the very heart of this lawsuit, are

clearly at odds with plaintiffs' own theory of causation regarding their failure to warn claim.

The discarding of the most important evidence in this case has rendered an informed

verdict on the issue of causation impossible, and plaintiffs appear to exploit this uncertainty by

playing both sides of the causation fence in a manner which raises fundamental fairness

concerns. Plaintiffs appear to adopt a "heads I win, tails you lose" approach to causation, while

making it impossible for the jury to ever reliably determine the results of the coin flip in the first

place. Plaintiffs might respond that they are entitled to advance alternative factual theories in

this case and to argue that there was more than one potential cause for the injuries which they

suffered. The court agrees. It is clear, however, that the plaintiffs' theory of the case should at

least be consistent with the proposed testimony offered by their expert witness, or else they

simply impeach their own case.

It is certainly arguable that, in the absence of the actual jib boom, the plaintiffs would be

unable to meet their burden of proof in this case with even the most reliable expert testimony.

However, Sero's testimony does not meet the minimal standards of reliability under *Daubert* and this constitutes an additional reason for the dismissal of plaintiffs' claims. Expert testimony is not admissible unless the expert is qualified and the opinion is scientifically valid and methodologically sound. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993). The party offering the expert testimony bears the burden of proving that the testimony is admissible. *Smith v. Goodyear Tire & Co.*, 495 F.3d 224, 227 (5th Cir. 2007). The expert must base the opinion on sufficient facts or data, employ reliable principles and methods in forming the opinion, and reliably apply the principles and methods to the facts of the case. Fed. R. Evid. 702. The purpose of the *Daubert* inquiry is to ensure that the proposed expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

This court has the greatest skepticism regarding how Mr. Sero might opine, without having personally inspected the jib boom, that "[t]he welding repair of the aluminum jib by Roy Owens near the end of the aluminum jib was not a substantial factor in the jib failure that occurred in this incidence." To reiterate, all parties agree that welding an aluminum jib boom can cause it to fail and that the jib in this case did, in fact, fail on the first occasion in which it was used after it was welded. Moreover, once again, plaintiffs' own failure to warn claims are based upon the implicit assumption that the welding was a proximate cause of the jib boom failure. In light of these facts, Sero loses a great deal of credibility with this court by purporting to state with confidence that the welding of the jib boom was not a substantial factor in its failure. Sero's opinion that "the weld did not fail" is itself based on the self-serving testimony of plaintiffs that the jib boom broke inches away from the weld location and that the weld itself

held.[1]  Plaintiffs' discarding of the jib boom ensured that defendants would never have an

opportunity to test this assertion, and, at any rate, defendants' expert testified that welding may

weaken the structure of an aluminum jib even at locations other than the weld itself.  It seems

clear to this court that the dispute in this context can only be reliably resolved by inspecting the

jib boom itself, likely on a microscopic level.

This court frankly doubts that the world's foremost metallurgist or design expert could

reliably testify regarding the issue of causation in this case, even after conducting extensive

testing regarding a substitute jib boom of the same make and model.[2]  This is because unique

and specific alterations were made to the jib boom in this case during the welding process, and

there is, in the court's view, simply no way for any expert to determine, without inspecting the

actual boom in question, what effect that welding process had upon its structural integrity.

Defendants' arguments relating to Sero's qualifications and the weaknesses in his methodologies

are set forth in detail in their *Daubert* motion, and the court finds these arguments persuasive and

adopts them herein.  Defendants describe Sero as being a "generalist" who has only limited

experience relevant to the issues in the case, and the court agrees.  This court also agrees with

defendants that, particularly in light of the discarding of the jib boom, Sero should have at least

---

[1]There is some contradiction among plaintiffs' witnesses regarding exactly how close to
the weld the jib boom broke.  Bobby Miller testified that it broke approximately one-and-a-half
inches from the weld, while his son Shan testified that he could not be sure of the exact distance
but that he thought it broke approximately two to three inches from the weld.

[2]The court would emphasize that its view in this regard is limited to the issue of
causation.  In the court's view, plaintiffs may well have been able to present reliable expert
testimony, based on objective testing, regarding the issue of whether a design defect existed in
the jib boom at issue in this case.  They did not do so, however, and this constitutes an additional
reason for dismissing their claims.

attempted to conduct testing in support of his design defect theories.

While the court thus finds the arguments raised in defendants' *Daubert* motion to be persuasive, its greatest skepticism regarding Sero's testimony arises from the simple fact that he confidently offers highly specific and nuanced conclusions regarding a piece of evidence which he has never laid eyes upon. Moreover, he appears to alter his conclusions to fit the particular claim at issue, in a manner which often contradicts his prior conclusions and which even further damages his credibility with the court. At one point in his affidavit, Sero appears to try to reconcile his view that the welding was not a substantial factor in the accident with plaintiffs' failure to warn claims, writing that:

> 55. I have never attributed the upper jib arm failure to a fatigue that occurred after the repair. My deposition testimony and my professional opinion is and always has been, that it was a fatigue stress that caused the initial damage and that the welding after the initial crack only served to further weaken the material.

Considering these two statements together, Sero's position appears to be that the welding did, in fact, serve to "weaken" the jib boom, but that this weakening was not so severe as to rise to the level of being a "substantial factor" in the boom's ultimate failure.

The court is at a loss to understand how Sero can purport to offer such highly detailed and nuanced conclusions regarding a jib boom which he has never seen, much less tested or examined microscopically. Sero's opinion would strike this court as being an ambitious one for an expert to offer even if he had performed an intensive metallurgical examination of the actual jib boom. For Sero to offer that opinion without even having examined the boom simply destroys his credibility in the eyes of the court. Moreover, some of the statements in Sero's affidavit simply make no sense at all. At one point in his affidavit, Sero defensively states that:

> Defendants' assertion that I did no testing or engineering analysis is inaccurate

and mis-stated. Admittedly, no testing was done, but neither was there any
testing done by the defense expert, Moore, to determine the initial causation of
the jib's cracking.

To state the obvious, when Sero acknowledges that he performed no testing in this case, he

confirms as *accurate* defendants' assertion to that effect. The fact that defendants' expert

likewise performed no testing is beside the point, and, at any rate, it is plaintiffs, not defendants,

who have the burden of proof in this case.

In the court's view, plaintiffs' admitted failure to perform any testing is fatal to their

ability to even establish that the jib boom in this case was defectively designed, quite apart from

the issue of causation. As noted previously, the plaintiffs present a coherent *theory* that the jib

boom was defective, arguing that it should have been fitted with a steel cap similar to that which

was retrofitted on previous, recalled versions of the jib boom in this case. Defendants respond

that different, but equally effective, modifications were made to the jib boom which distinguish

it from the recalled versions. Actual testing (such as on substitute jib booms of the same make

and model) might have assisted plaintiffs in proving that the modifications made by defendant

were insufficient, but they elected not to perform such testing. This failure is likely immaterial

in light of the fact that plaintiffs would have been unable to prove causation regardless without

the actual jib boom, but it does constitute an additional reason for striking Sero's testimony.

After reviewing this expert's submissions and testimony, the court concludes that it does not

meet the minimal standards of reliability set forth in *Daubert* and must be stricken in its entirety.

Plaintiffs may not maintain their claims without Sero's expert testimony, and the striking of that

testimony therefore constitutes an additional basis for dismissing those claims.

The court's conclusion that plaintiffs' claims must be dismissed is also strengthened by

the fact that some of those claims are based upon an apparently groundless "conspiracy theory" which renders the factual basis of their case even more suspect. As discussed previously, plaintiffs allege that no manuals were provided with the TMZ 34/19 which Miller purchased, and they complain in particular about not being warned against welding on the lift's upper jib boom. It is thus highly damaging to plaintiffs' failure to warn claims that, during his inspection of the aerial lift (minus the discarded jib boom), Genie's representative Luke Webber did, in fact, find a copy of an Equipment Manufacturers Institute (EMI) Aerial Platform Safety Manual which provides clear instructions against welding, as follows:

> **Welding Cautions.** Never weld on hydraulic cylinders, boom, elevating assembly or any structural member without the consent of the manufacturer of your machine. These may be made of special metals which might require special welding techniques or have a design which should not have welded repairs.

Defendant has offered proof that it was standard Genie practice to include this manual in the aerial lifts which it sold.

In attempting to rebut defendants' proof on this issue, plaintiffs implied that Webber planted this manual during his inspection, although they stopped just short of directly accusing him of such. In an August 4, 2011 response to defendants' motion for summary judgment, plaintiffs' counsel Paul Ledbetter, writes that:

> The EMI manual was "located" by Mr. Webber, Genie Product Safety Engineer, out of the presence of the Millers or counsel, and its presence and availability to Plaintiffs before the 5/27/09 accident are disputed facts as Defendant notes.

By using the word "located" in quotes, and noting that Webber found the manual outside the presence of plaintiffs and their counsel, plaintiffs clearly attempt to raise the inference that he planted it. However, this response was written by Ledbetter several months *after* he became aware that the manual was already present in the lift *prior* to Webber's inspection and that any

12

accusations against him were baseless.

On January 21, 2011, Ledbetter sent counsel for defendants an apologetic email stating that additional inspection of photographs showed that the EMI Manual was already present prior to Webber's inspection:

> After review of the photos we have, it appears that the EMI Manual was in place at the time of our photos, more than a year after the accident; however, at minimum, I owe an apology to some folks, Ross/Mark, Luke. I am sorry that this was an issue. It was an oversight on my part. I regret that this is not my only mistake in life. I do not know who took the photo but I'll find out. It antedated the inspection.

Defendant cites this e-mail in support of a motion *in limine*, filed in December 2011, to prevent plaintiffs from raising any argument that the manual was planted. The court concludes that the proper response would have been for plaintiffs to simply concede this motion, preferably in the same apologetic tone which Ledbetter adopted in his e-mail to defense counsel. Instead, plaintiffs appear to cling doggedly to their conspiracy theory, continuing to maintain that the manual was not present in the aerial lift at the time of sale. Obviously, plaintiffs do not contend that the manual magically appeared in the lift of its own volition; they clearly want the jury to conclude that some unnamed representative of defendant planted it.

This court has serious concerns regarding plaintiffs' position in this regard, and it accordingly e-mailed their counsel (with all parties cc:ed) to explain it. Ledbetter responded that plaintiffs "make no claim that Webber planted the manual, only that plaintiffs dispute its presence at the time of sale of the lift." The problem with this argument, other than the complete lack of objective proof supporting it, is that plaintiffs appeared to specifically single out Webber, in briefing before this court, for suspicion of having planted the manual at a time when they had already admitted that he did no such thing and had apologized for suggesting otherwise. This

court considered whether some form of sanctions would be in order based upon Ledbetter's

representations, but it ultimately concluded that plaintiffs' arguments in this context were too

vague to support such.  This incident has, however, served to seriously damage whatever

credibility plaintiffs had remaining in this lawsuit.  The court finds that there are multiple,

independently sufficient bases for dismissing plaintiffs' claims in this case, and defendants'

motions to strike Sero's expert testimony and for summary judgment will therefore be granted.

In light of the foregoing, it is ordered that defendants' motions to strike Sero's expert

testimony [80-1] and for summary judgment [78-1, 82-1] are granted.

A separate judgment will be issued this date, in accordance with Fed. R. Civ. P. 58.

SO ORDERED, this 19th day of January, 2012.


/s/ Michael P. Mills
CHIEF JUDGE
U.S. DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI